UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CADENCE DESIGN SYSTEMS, INC., <br><br>  Plaintiff, <br><br> v. <br><br> POUNCE CONSULTING, INC., et al., <br><br>  Defendants. | Case No. 17-cv-04732-PJH   (SK) <br><br> **AMENDED REPORT AND RECOMMENDATION REGARDING DEFAULT JUDGMENT AGAINST POUNCE CONSULTING, INC.** <br><br> Regarding Docket No. 209 |

On January 23, 2019, this Court issued its Amended Report and Recommendation that the District Court enter a default judgment against Defendant Pounce Consulting, S.A. de C.V. ("Pounce SA"). (Dkt. 205.) In the Report and Recommendation, the Court did not address the issue of whether Pounce SA and its co-Defendant Pounce Consulting, Inc. ("Pounce USA") share liability under an *alter ego* theory. (*Id.*) On January 30, 2019, the District Court entered default against Pounce USA for failure to comply with its order to retain counsel within 30 days after its previous counsel withdrew from representation. (Dkt. 206.) On February 22, 2019, Plaintiff Cadence Design Systems, Inc. ("Cadence") brought a motion for default judgment against Pounce USA. (Dkt. 209.) The District Court referred that motion to this Court for a report and recommendation pursuant to Local Rule 72-1. (Dkt. 210.)

Having considered the *alter ego* allegations against Pounce USA in conjunction with the record in the case and the default judgment entered against Pounce SA, and for the reasons stated below, the Court RECOMMENDS that the District Court GRANT and certify Plaintiff's request for default judgment pursuant to Federal Rule of Civil Procedure 54(b). The Court further RECOMMENDS that damages and injunctive relief be awarded as provided below.

## BACKGROUND

**A.  The Parties**

Cadence Design Systems, Inc. ("Cadence") is a Delaware corporation with its principal place of business in San Jose, California.  (First Amended Complaint at Dkt. 26 ("FAC"), ¶¶ 2, 16.)  Cadence provides electronic design automation software, engineering services, and semiconductor intellectual property which "help engineers design transistors, standard cells, and IP blocks that make up systems on chips, as well as integrated circuits and printed circuit boards." (*Id.*, ¶ 16.)  Cadence's relevant design platforms include Allegro®, OrCAD®, and PSpice® products.  (*Id.*, ¶ 17.)[1]

Defendant Pounce SA is a Mexican Sociedad Anónima de Capital Variable with its principal place of business in Mexico.  (FAC, ¶ 4.)  Pounce SA "provides custom solutions in embedded design, electronics manufacturing, IT and staffing services."  (*Id.*, ¶¶ 25, 38.)  Pounce SA "offers services related to electronic design and requires certain engineers on its staff to be skilled in the use of Cadence's software and design suites." (*Id.*, ¶¶ 25, 40-43.)

Defendant Pounce USA is a California corporation with its principal place of business in San Diego, California.  (*Id.*, ¶ 3.)  Cadence alleges that Pounce USA is an *alter ego* of Pounce SA, but Pounce USA maintains that it is a small staffing agency that hires engineers and other professionals for projects in the United States.  (*Id.*, ¶¶ 5-10; Answer at Dkt. 41, ¶ 11.)

**B.  The Default Judgment Against Pounce S.A.**

In its prior report and recommendation, this Court evaluated Cadence's motion for default judgment against Pounce SA under the *Eitel* factors.  (Dkt. 205); *Eitel v. McCool,* 782 F.2d 1470,

---

[1] Cadence's software program Allegro allows users to design and test the physical layout ("floorplan") of circuit boards. (Alfaro Declaration at Dkt. 54-7, ¶ 5.)  Cadence's PSpice software allows engineers to simulate and verify circuitry designs.  (*Id.*, ¶ 7.)  Cadence's OrCAD software enables the user to floorplan electronic components on a printed circuit board.  (*Id.*, ¶ 8.)  Once the design is finalized, the OrCAD software can export manufacturing data instructions in a variety of formats to fabricate the printed circuit board.  (*Id.*)

1471-72 (9th Cir. 1986) (in determining whether default judgment is appropriate, the court weighs seven factors: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits).

The Court first evaluated the merits of the substantive claims and the sufficiency of the Complaint. (Dkt. 205 at 10-13.) The Complaint alleges that Pounce SA relies on Cadence's software programs to conduct its business, yet Pounce SA owns no legal copies of Cadence's software. (FAC, ¶¶ 44, 69.) According to Cadence's tracking mechanisms, Pounce SA used Cadence's software without authorization thousands of times on at least twenty-five different machines identified as affiliated with Pounce SA. (*Id.*, ¶¶ 62-63.) The domains "corp.pounceconsulting.com" and "pounceconsulting.com" and email addresses "@corp.pounceconsulting.com" and "@pounceconsulting.com" are linked to machines using unauthorized reproductions of Cadence's software. (*Id.*,*¶¶* 64-66; Dkt. 54-7*, ¶* 22.)

There were also other uses that revealed computers with machine names, such as "pounce-pc," "pounce-59fdb41d," and machines with names of Pounce SA's employees, such as "vnavarro" (Victor Navarro) and "Nicolas-i7PC" (Nicolas Izquierdo). (FAC, ¶ 68; *see also* Dkt. 182-4 (Viera Deposition Transcript at 179:6-180:3; 181:12-182:15). In addition, Cadence detected IP addresses associated with Pounce SA. (FAC, ¶ 67.) Cadence likewise presented evidence confirming Pounce SA's use of Cadence's software to perform its contracts with third parties. (Ruttenberg Dec., Dkt. 182-2, ¶¶ 7, 9-11, 15, Exs. F, H-J, N (181-10, 181-12 through 181-14, 181-18); Choudhary Dec., Dkt. 181-7, ¶¶ 15-39 (the schematics produced by third parties contain aspects unique to Cadence's software.)) On January 28, 2016, Cadence advised Roger Viera, the President and CEO of Pounce SA, that Pounce SA was using counterfeit ("cracked") and

unauthorized versions of Cadence's software and that Cadence sought to resolve the matter without litigation. (*Id.*, ¶¶ 70-72.) Pounce SA ignored additional communications and refused to pay for any past software use. (*Id.*, ¶¶ 72, 73.)

Based on the allegations in the Complaint, the Court concluded that Cadence had adequately asserted claims for copyright infringement under 17 U.S.C. § 501, circumvention of copyright protection systems in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(the "DMCA"), and breach of the Software License Agreement contract governing use of Cadence's software. (Dkt. 205 at 10-13.) Evaluating the remaining *Eitel* factors, the Court concluded that default judgment was warranted because Plaintiff Cadence would have been prejudiced by an inability to enforce its intellectual property rights absent a default judgment, there was no dispute of material fact presented by the parties about the alleged infringement, Pounce SA's failure to defend the action did not appear to arise from excusable neglect, the amount of money at stake was proportional to the egregious conduct alleged, and litigation on the merits was precluded by Pounce SA's refusal to litigate the case. (*Id.* at 13-14.)

The Court awarded actual damages for breach of contract in the amount of $783,310 plus prejudgment interest accrued at the rate of 1.5% per month through the date of final judgment; disgorgement of profits for copyright infringement in the amount of $2,973,065.73, as permitted by 17 U.S.C. § 504(b); and statutory damages in the amount of $2,079,900, or $300 for each of the 6,933 infringing incidents, in accordance with the DMCA, 17 U.S.C. § 1203(c)(3)(A). (*Id.* at 15-17.) The Court also awarded Cadence attorneys' fees and costs and permanently enjoined Pounce SA from any future use of Cadence's software. (*Id.* at 17-18.)

**C.      Cadence's Motion for Default Judgment Against Pounce USA**

Cadence now seeks a default judgment against Pounce USA awarding the same remedies it obtained against Pounce SA, including identical damages, fees and costs, and injunctive relief. (Dkt. 209.) Cadence argues that such relief is justified because Pounce SA and Pounce USA are

4

in fact *alter egos* of one another. (*Id.*)

**D.  Service and Jurisdiction**

  **1.  Service**

Pounce USA was served with process in this action on August 18, 2017. (Dkt. 9.) Pounce USA filed its answer to the Complaint on September 28, 2017. (Dkt. 15.) Pounce USA has not contested the propriety of service in this action.

  **2.  Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over Cadence's action. Specifically, Cadence's allegations pursuant to 17 U.S.C. § 501, *et seq.* (copyright infringement) and 17 U.S.C. § 1201, *et seq.* (circumvention of copyright protection systems under the DMCA) give rise to federal question jurisdiction under 28 U.S.C. §§ 1331, 1338. The Court has supplemental jurisdiction over Cadence's breach of contract claim. 28 U.S.C. § 1367(a).

Cadence is a Delaware corporation with its principal place of business in this district. Pounce USA is a California corporation with its principal place of business in San Diego, California. (FAC, ¶ 3.) Given the diversity of the parties and the fact that a sum greater than $75,000 is at issue, the Court also has diversity jurisdiction in accordance with 28 U.S.C. § 1332.

  **3.  Personal Jurisdiction**

Before entering default judgment, a court must determine whether it has jurisdiction over defendants. *See In Re Tuli v. Rep. of Iraq,* 172 F.3d 707, 712 (9th Cir. 1999). In *Tuli,* the Ninth Circuit explained that, where a plaintiff seeks default judgment, the court may not assume the existence of personal jurisdiction, because a judgment in the absence of personal jurisdiction is void. *Tuli,* 172 F.3d 712. Where there are questions about the existence of personal jurisdiction in a default, the court should provide the plaintiff with the opportunity to establish the existence of personal jurisdiction. *Id.*

Here, the Court's personal jurisdiction over Pounce USA is clear. A resident of the forum state is presumptively subject to personal jurisdiction there. *See, e.g.*, *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 n.3 (9th Cir. 2010) (noting that a resident of

California is unquestionably subject to personal jurisdiction in California) (abrogation other grounds recognized by *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017)). A corporation is resident in the state where it is incorporated or has its principal place of business. *Contractors Bonding & Ins. Co. v. Am. Lighting Indus., Inc.*, No. EDCV08813VAPJWJX, 2008 WL 4447680, at *3 (C.D. Cal. Oct. 1, 2008) ("A corporation is a citizen and therefore subject to personal jurisdiction in both its state of incorporation and the state of its principal place of business. 28 U.S.C. § 1332(a)."). Pounce USA is a citizen of California because it is incorporated and has its principle place of business in the state. (FAC, ¶ 3.) Accordingly, Pounce USA is unquestionably subject to this Court's personal jurisdiction.

## ANALYSIS

### A.   Standard Governing Default Judgment

Under Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment following entry of the party's default based upon a failure to plead or otherwise defend the action. A district court's decision to enter a default judgment involves some discretion. *Lau Ah Yew v. Dulles,* 236 F.2d 415, 416 (9th Cir. 1956) (affirming district court's denial of default judgment). As discussed above, in determining whether default judgment is appropriate, the Ninth Circuit has enumerated the following factors for considerations:

> (1) The possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel,* 782 F.2d at 1471-72.

After default is entered, the well-pleaded allegations in the complaint regarding liability are deemed true, except as to damages. *Fair Housing of Marin v. Combs,* 285 F.3d 899, 906 (9th Cir. 2002). The court is not required to make detailed findings of fact. *Id.* Moreover, default judgment cannot exceed the amount demanded in the pleadings. Fed. R. Civ. P. 54 (c). Upon

6

1  review of the well-pleaded allegations in this case, the Court finds that the *Eitel* factors weigh in

2  favor of default judgment against Pounce USA under an *alter ego* theory of liability.

### B.     Standard Governing *Alter Ego* Liability

Ordinarily, a legal fiction separates the identity of a corporation from that of its officers and owners for purposes of determining liability. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824, 836 (2000). However, courts may disregard the fiction and pierce the corporate veil "where an abuse of the corporate privilege justifies" doing so. *Id.* "Under the *alter ego* doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation." *Id.* In California, there are two general requirements for a finding of *alter ego* liability: "(1) such a unity of interest and ownership between the corporation and its equitable owner that no separation actually exists, and (2) an inequitable result if the acts in question are treated as those of the corporation alone." *Leek v. Cooper*, 194 Cal. App. 4th 399, 417, 125 Cal. Rptr. 3d 56, 69 (2011).

Courts consider several factors in undertaking the *alter ego* analysis, including: commingling of funds and other assets; unauthorized diversion of corporate funds or assets to other than corporate uses; treatment by an individual of the assets of the corporation as his own; failure to maintain minutes or corporate records; sole ownership of all the stock in a corporation by one individual; failure to adequately capitalize a corporation; use of a corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation; disregard of legal formalities; diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors; use of a corporation as a subterfuge for illegal transactions. *Pac. Bell Tel. Co. v. 88 Connection Corp.*, No. 15-CV-04554-LB, 2016 WL 3257656, at *2-3 (N.D. Cal. June 14, 2016) (citing *Leek*, 194 Cal. App. 4th at 417).

A plaintiff need not establish every factor to establish *alter ego* liability. *Updateme, Inc. v. Axel Springer SE*, No. 17-cv-05054-SI, 2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018).

**C.      Pounce USA is the *alter ego* of Pounce SA.**

In its Complaint and throughout this litigation, Cadence has alleged facts sufficient to support the existence of several *alter ego* factors.

Cadence has established that Pounce USA and Pounce SA share common ownership. Pounce USA, through communications of its counsel and in its Answers, denies any relationship to Pounce SA and claims it was sued purely on the basis of mistaken identity because of the similar names of the two companies. (Dkt. 66-2; Dkt. 15 ¶¶ 5-7; Dkt. 41 ¶¶ 9-11.) However, Roger Viera, who is the CEO of Pounce SA, has testified that he personally owns 70 percent of Pounce USA and that Pounce USA is the "sister company" of Pounce SA. (Dkt. 209-3 (Ruttenberg Dec. Ex. A at 23:5); Dkt. 69-2 (Viera Dec. ¶ 4, 11).) Tax records demonstrate that Pounce SA owns 70 percent of Pounce USA. (Dkt. 208-15 (Eshaghian Dec. Ex. L).) Juan Llera, who claims to own the remaining 30 percent of Pounce USA, receives a salary as an employee of Pounce USA, but does not take profits and has not contributed to the company's capitalization. (Dkt. 157-2 at 3; Dkt. 208-7 (Eshaghian Dec. Ex. B at 135:8-12); Dkt. 208-5 (Eshaghian Dec. Ex. A at 235:19-24).)

Cadence has also established that Pounce USA and Pounce SA do not in practice maintain separate operations or observe corporate formalities. The same individuals have served as officers and directors of both entities simultaneously. Roger Viera serves as CEO of Pounce SA, (Dkt. 208-5 (Eshaghian Dec. Ex. A at 23:5)), and as CFO of Pounce USA (Dkt. 208-5 (Eshaghian Dec. Ex. A at 86:18-23)). Roger Viera claims to perform no roles as CFO, yet states on Pounce USA's tax return that he devotes 100 percent of his time to the business. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 86:24-25); Dkt. 208-15 (Eshaghian Dec. Ex. L).) Juan Llera claims that he is "CTO, CIO, CEO, managing partner, and any other role" at Pounce USA. (Dkt. 208-7 (Eshaghian Dec. Ex. B at 31:2-5).) Yet Roger Viera routinely executes contracts as CEO of Pounce USA. (Dkt. 101-10 (Papazian Dec. Ex. P (October 2016 Settlement Agreement with TableSafe, Inc.)); Dkt. 208-14 (Eshaghian Dec. Ex. K at 14 (August 2015 contract with TableSafe, Inc.)); Dkt. 208-16

(Eshaghian Dec. Ex. M at 8 (March 2015 contract with Mygnar, Inc.)).  Roger Viera has also represented himself as CEO of Pounce USA in email correspondence.  (Dkt. 208-17 (Eshaghian Dec. Ex. N).)  Llera also represents himself as CTO of Pounce SA, though he claims to have stopped working there around 2012.  (Dkt. 208-7 (Eshaghian Dec. Ex. B at 25:8-18); Dkt. 66-4 (Llera LinkedIn profile as of March 22, 2018 describing his occupation as "CTO at Pounce Consulting" from 2009 to present); Dkt. 102-7 (Ruttenberg Dec. Ex. F) (email from Viera to Cadence describing Llera as "my CTO").)

Cadence has alleged facts that illustrate how Pounce SA and Pounce USA commingle resources and operate as a single enterprise.  Pounce SA and Pounce USA share an email server.  (Dkt. 157-16 (Ruttenberg Dec. Ex. R at 77:17-79:23).)  Though the two entities are used interchangeably for business operations, no written agreement governs their relationship.  (Dkt. 208-7 (Eshaghian Dec. Ex. B at 165:12-166:18) (Pounce USA collects invoices on behalf of Pounce SA and no written agreement governs the process); *Id.* at 169:16-170:25 (same); *Id.* at 47:4-17 (Pounce USA pays legal bills for Pounce SA in this litigation, without related written arrangement); Dkt. 209-8 (Ruttenberg Dec. Ex. J ¶¶ 2-4) (Roger Viera correcting his deposition testimony to clarify that there are no written agreements between Pounce USA and Pounce SA related to the MyGnar contract, the TableSafe contract, or package consolidation); Dkt. 208-7 (Eshaghian Dec. Ex. B at 110:5-7) (no written agreement installing Llera as CEO of Pounce USA); *Id.* at 235:3-21 (Pounce USA pays Roger Viera around $10,000 per month, but no written agreement governs the transactions).  Despite Defendants' protestations that the two entities are unrelated, Pounce USA and Pounce SA commingle funds (Dkt. 208-19 (Eshaghian Dec. Ex. P) (financial statements showing net transfers of over $716,000 from Pounce USA to Pounce SA in 2015 and over $513,000 from Pounce USA to Pounce SA in 2016).)  Pounce USA did not produce tax documentation related to these transactions.  (Dkt. 208-9 (Eshaghian Dec. Ex. D at 82:16-84:14; 91:16-23).)

Plaintiffs have demonstrated that Pounce USA and Pounce SA represent themselves publicly as a single entity.  (Dkt. 29-2 (Proof of Service, Ex. B) (Pounce USA website characterizing Pounce USA's San Diego address as "US Corporate" and Pounce Mexico's

9

Guadalajara address as "Global Delivery Center); Dkt. 208-20 (Eshaghian Dec. Ex. R) (email from Roger Viera describing "Pounce" as "a tech-firm headquartered in Guadalajara, Mexico, with offices in San Diego, CA").) The two companies also share employees. Thania Herrera is paid by Pounce USA, but works on Pounce SA matters, including coordinating shipping, depositing checks, and acting as Roger Viera's assistant. (Dkt. 208-8 (Eshaghian Dec. Ex. C at 59:12-21; 137:9-138:6; 65:9-16).) Another employee, Georgina (last name not identified), was paid by Pounce USA while working for Pounce SA. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 251:3-15; 254:1-8).) And Hector (last name not identified), another employee, worked for Pounce USA and Pounce SA simultaneously. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 269:1-16).)

Cadence has adduced ample evidence that Viera treats Pounce USA as a personal piggy bank. Viera uses Pounce USA funds to pay Pounce SA expenses. (Dkt. 209-10 (Ruttenberg Dec. Ex. Q).) Viera keeps an account in Pounce USA's name for his personal use. (Dkt. 208-7 (Eshaghian Dec. Ex. B at 149:13-150:23).) And Pounce USA routinely funds Viera's personal expenses, including renting an apartment for his ex-wife at the Ritz-Carlton in Los Angeles and bespoke tailoring. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 17:13-20, 143:13-15); Dkt. 208-7 (Eshaghian Dec. Ex. B at 139:8-140:2, 143:24-145:10).) Herrera personally traveled from San Diego to Los Angeles in the course of her employment by Pounce USA to take care of a parking ticket Viera had received on his Los Angeles Ferrari while he was in Mexico. (Dkt. 208-8 (Eshaghian Dec. Ex. C at 179:12-25).)

Finally, Cadence has demonstrated that Pounce USA is intentionally undercapitalized. From the beginning of 2016 to the end of 2017, Pounce SA funneled over $1.2 million out of Pounce USA. (Dkt. 208-19 (Eshaghian Dec. Ex. P).) Meanwhile, Viera keeps Pounce USA afloat with small distributions from his own and Pounce SA's accounts. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 134:22-135:23, 319:24-321:16, 322:19-324:8).) Viera sold his Ferrari and channeled the funds into Pounce USA. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 255:10-14, 256:8-14).) And Pounce SA pays Pounce USA's legal bills. (Dkt. 208-5 (Eshaghian Dec. Ex. A at 325:16-21); Dkt. 208-7 (Eshaghian Dec. Ex. B at 46:13-47:3).) When asked why Pounce USA, rather than Pounce SA, would be the entity to sign a licensing agreement with a third party, Viera replied:

"Because it is the one that has no ASSETS !!! [sic]" (Dkt. 208-11 (Eshaghian Dec. Ex. F).) This is clear evidence of use of Pounce USA and Pounce SA's abuse of the corporate form to shield assets.

Many of the *Pacific Bell* factors supporting an *alter ego* finding are present in this case. Pounce USA is the *alter ego* of Pounce SA because the two entities are commonly owned, do not observe corporate formalities, commingle funds and function as a single enterprise, and represent themselves publicly as a single entity. To further these purposes, Pounce USA is deliberately undercapitalized, and Viera alternatively raids and funds it as though it were a personal account. The presence of these factors confirms that there is "such a unity of interest and ownership between" Pounce USA and Pounce SA "that no separation actually exists." *Leek*, 194 Cal. App. 4th at 417. Further, treating the two entities separately would lead to "an inequitable result." *Id.* As the facts Cadence has adduced and the course of this litigation demonstrate, Pounce USA strategically denies its relationship to Pounce SA to obfuscate reality and avoid consequences for both entities. Denial of *alter ego* liability in this case would enable that shell game to continue, allowing Pounce SA to avoid paying the default judgment owed to Cadence. The Court accordingly finds that Pounce USA is the *alter ego* of Pounce SA.

### D.    Default Judgment is warranted against Pounce USA.

Default Judgment was warranted against Pounce SA based on Cadence's allegations; therefore, it is also warranted against Pounce USA because Pounce USA has defaulted and is Pounce SA's *alter ego*. Pounce USA failed to defend this case, and the Court entered default against it for failure to retain counsel and noncompliance with court order on January 30, 2019. (Dkt. 206.) Applying the *Eitel* factors, the Court concludes that entry of default judgment is warranted against Pounce USA. *Eitel,* 782 F.2d at 1471-72.

#### 1.    Plaintiff Cadence would be prejudiced absent the entry of a default judgment against Pounce USA.

As demonstrated above, Pounce SA and Pounce USA are engaged in the same enterprise. And much of that enterprise appears to depend on illegal use of Cadence's software, as this Court found in its previous recommendation. (Dkt. 205.) Courts have held that plaintiffs are prejudiced where defendants continue to profit from products that infringe their intellectual property. *Dr. JKL Ltd. v. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048-49 (N.D. Cal. 2010). As was true with Pounce SA, Cadence lacks recourse against Pounce USA insofar as that entity refuses to defend Cadence's claims against it on the merits in court. And absent the opportunity to litigate and receive a judgment, Pounce USA may continue its infringing behavior with impunity. Moreover, Cadence would be doubly prejudiced by a failure to hold Pounce USA accountable here because of the *alter ego* relationship between the two entities. It seems likely that, absent a default judgment against both entities, Pounce USA will be used as a conduit for Pounce SA to shield its assets from Cadence's efforts to collect its judgment. Accordingly, this factor supports entry of a default judgment against Pounce USA.

### 2. Cadence has sufficiently alleged facts to demonstrate that its substantive claims against Pounce USA are meritorious.

As discussed above, this Court has held that Cadence has adequately asserted claims against Pounce SA for copyright infringement, violation of the DMCA, and breach of contract. And Cadence has sufficiently established that Pounce USA is the *alter ego* of Pounce SA. *See Li v. A Perfect Day Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2012 WL 2236752, at *10 (*alter ego* allegations taken as true in entering default judgment). It therefore stands to reason that Pounce USA is engaged in the same course of conduct that gave rise to the Court's prior finding against Pounce SA. Accordingly, Cadence has adequately asserted its substantive claims against Pounce USA, justifying default judgment.

### 3. The egregiousness of Pounce USA's conduct justifies entry of default judgment in the amount Cadence seeks.

In deciding a motion for default judgment, a court must consider the amount of money at stake in relation to the seriousness of the defendant's conduct. *Pepsico, Inc v. California Security Cans,* 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002). When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged. *Eitel,* 782 F.2d at 1472 (three

million dollar judgment supported decision not to enter default judgment).

In its motion for default judgment against Pounce USA, Cadence seeks actual damages (license fees plus interest), disgorgement of profits, and statutory fees. Cadence asks that the same remedies awarded against Pounce SA be awarded against Pounce USA, for a total monetary award of $6,834,950. The Court finds that, as the *alter ego* of Pounce SA, Pounce USA is liable for damages in the same amount. Thus, the amount of money at issue is significant. However, Pounce USA's conduct, in conjunction with Pounce SA, was serious and egregious. There were a significant number of infringing incidents – at least 6,933. (Phan Dec. at Dkt. 55-3, ¶ 7.) Further, Pounce USA's infringing conduct and *alter ego* collusion with Pounce SA was intentional. Pounce USA also refused to participate in or cooperate with the current litigation. Although the sum at stake is a significant sum, the circumstances warrant such an award.

**4.     There is no dispute of material fact at issue here.**

There is no information regarding a dispute of material facts. The Court was careful to ensure that there is sufficient evidence establishing that Pounce USA is the *alter ego* of Pounce SA. And in its prior recommendation, the Court carefully established that there was sufficient evidence showing that Pounce SA infringed upon Cadence's copyrighted software, circumvented the protections that Cadence put in place to control access to its intellectual property, and violated the terms of the software license agreement before calculating damages and granting injunctive relief. The *alter ego* issue, Cadence's substantive claims, and the related calculation of damages pose no material issue of fact that precludes granting Cadence's motion against Pounce USA.

**5.     There is no evidence of excusable neglect in this case.**

There is no indication that Pounce USA's failure to defend this litigation or participate in the present proceeding is the result of excusable neglect. Pounce USA previously appeared in the litigation and yet refused to continue with new counsel. Thus, Pounce USA's failure to defend the litigation appears intentional rather than the product of neglect.

**6.     Decision on the merits is not possible given Pounce USA's conduct.**

Despite the policy of favoring decisions on the merits, default judgment is appropriate when a defendant refuses to litigate a case. Fed. R. Civ. P. 55(b); *see Bd. of Trustees v. RBS*

*Washington, LLC,* 2010 WL 1450897 at *4 (N.D. Cal. Jan. 8, 2010.)  Here, Pounce USA refused to litigate, and Cadence had no option other than to pursue a default judgment.

In light of the foregoing, the undersigned RECOMMENDS that default judgment be entered against Pounce USA.  Further, having considered the Pounce USA's awareness and prior involvement in the current litigation, the Court sees no just reason to delay the entry of judgment and further RECOMMENDS that judgment be entered pursuant to Rule 54(b).

## **REMEDIES**

Pounce SA and Pounce USA are jointly and severally liable to Cadence for breach of contract, copyright infringement, and DMCA violations.  This Court awards the following remedies against Pounce USA both directly and as an *alter ego* of Pounce SA.

The damages the Court previously awarded to Cadence against Pounce SA are attributable to Pounce USA as well.  To recover damages after securing a default judgment, the plaintiff must prove entitlement to relief by testimony or written affidavit.  *PepsiCo., Inc.,* 238 F.Supp.2d at 1175 (citing *TeleVideo Systems, Inc.,* 826 F.2d at 917-18.)  Here, Cadence seeks $783,310 in lost licensing revenue plus $998,675 in interest under the claim for breach of contract.  Cadence seeks disgorgement of Pounce SA's profits ($2,973,065.73) for copyright infringement, as permitted by 17 U.S.C. § 504(b).  For the DMCA claim, Cadence requests statutory damages of $2,079,900 in accordance with 17 U.S.C. § 1203(c)(3)(A).  Finally, Cadence seeks injunctive relief pursuant to 17 U.S.C. § 502.

A.  **Breach of Contract – Actual Damages**

Cadence seeks its actual damages, or license fees, for unauthorized use by Pounce USA as *alter ego* of Pounce SA.  Cadence's tracking measures detected 6,933 unauthorized uses of Cadence Allegro, OrCad, and PSpice software by Pounce SA on twenty-six different computers. (Phan Dec. at Dkt. 55-3, ¶ 7.)  Cadence maintains that these are only a fraction of the actual uses because offline use of Cadence's software may not be detected.  (Dkt. 54-7, ¶ 25.)  Nevertheless, Cadence uses the 6,933 uses as the basis for calculating its damages.

Based on the number of offending machines, the programs used, and the number of detected unauthorized uses, Pounce USA and Pounce SA would need 31 annual licenses for

14

1  Allegro, 34 annual licenses for OrCad, 15 annual licenses for PSpice, and 36 annual licenses for
2  product options not available in the base license prices.  (Dkt. 55-3, ¶ 8.)  The cost of these
3  licenses is $783,310.  (Dkt. 55-3, ¶ 10.)

4  Further, under the Software Licensing Agreement, Cadence is entitled to interest at the
5  monthly rate of 1.5%.  (FAC, Ex. G, ¶ 5.)  As of November 14, 2018, Pounce SA and Pounce
6  USA owed Cadence $998,675 in prejudgment interest.  (Dkt. 181-8, ¶ 75-80.)  The Court finds
7  that a damages award including both the cost of the licenses and the prejudgment interest rate of
8  1.5% per month, accruing through the entry of final judgment, is reasonable.

### B. Copyright Violations – Disgorgement of Profits

Pounce USA is liable for Pounce SA's acts of copyright infringement, and, given the *alter ego* relationship between the two companies, disgorgement of the same profits is appropriate as to both entities.  According to 17 U.S.C. § 504(b), a plaintiff may recover "profits of the infringer that are attributable to the infringement," in addition to actual damages.  Cadence already seeks actual damages for its breach of contract claim, as described above.  "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

Because Pounce SA refused to provide discovery as to its customers or profits from the use of Cadence's software during the litigation, Cadence subpoenaed three Pounce SA customers: TableSafe (formerly known as Viableware), MyGnar, and Capstone Turbine.  (Dkt. 182, p. 19.)  Review of the schematics produced by these three customers indicates that Cadence's software was used in the schematics designed by Pounce SA.  (Choudhary Dec. at Dkt. 181-7, ¶¶ 15-39.)

Cadence retained Sidney Blum, who is a certified public accountant, a royalty auditor, an internal auditor, and an expert in damages.  (Blum Dec. 182-9, ¶ 5; Report, Dkt. 181-8, Ex. 1, ¶¶ 90-117.)  Blum calculated that Pounce SA derived a total revenue of $2,973,065 from the use of Cadence's software in providing services to all three customers.  (*Id*.)

Blum's opinion that Pounce SA received revenues of $2,078,314 from TableSafe was based on the deposition of TableSafe's Rule 30(b)(6) designee, Christopher Conley; a settlement

1 agreement between Pounce SA and TableSafe; and TableSafe's documentation of the payments
2 made to Pounce Consulting, United Capital Funding Corp., and Hernandez Marym, S.C. at the
3 instruction of Pounce SA.  (Dkt. 181-8, ¶¶ 90-99.)  Conley testified that Pounce SA created the
4 schematics purchased by TableSafe using Cadence's Allegro software.  (Dkt. 181-10 at 44:19-23,
5 102:18-22, 137:1-4.)  The basis for Blum's opinion that Pounce SA received $799,488 from
6 Capstone Turbine includes a scheduling agreement created by Capstone Turbine, Capstone
7 Turbine's accounts payable ledger, and copies of checks and invoices involving Pounce
8 Consulting Inc. or United Capital Funding Corp.  (Dkt. 181-8*.,* ¶¶ 100-106.)

9 In Blum's opinion, Pounce SA received $95,263 in gross revenue from MyGar.  (Dkt. 181-8, ¶ 116.)  Of this sum, $25,263 from MyGnar is based on payments for Master Design Services Agreement, a wire transfer made on April 1, 2015 in response to an invoice dated March 31, 2015 for work on the "Gnarbox."  (Dkt. 181-8, ¶¶ 107-116.)  MyGnar stock worth approximately $70,000 was also issued to Pounce Capital, Inc.  (Dkt. 181-8, ¶¶ 112, 113.)  The custodian of records at MyGnar authenticated the documents produced by MyGnar.  (Dkt. 181-24.)

Because Pounce USA did not oppose the motion for default judgment, there is no evidence that would reduce the gross revenue to a sum more representative of the actual profits received. However, since the disgorgement of profits is based solely on three of Pounce SA's customers and Pounce SA has an annual revenue of roughly $70 million (Vieira Dep at Dkt. 182-4, 193:4-15), the Court finds that the evidence supports the profits Blum calculated.  Therefore, the finds that an award of $2,973,065 for Cadence's copyright infringement claim is appropriate.

**C.     DMCA Statutory Damages**

Statutory damages for circumvention of the DMCA is $200 to $2,500 per act of circumvention.  17 U.S.C. § 1203(c)(3)(A). Cadence argues that its tracking measures have detected 6,933 unauthorized uses of Cadence Allegro, OrCad, and PSpice software by Pounce SA on twenty-six different computers.  (Phan Dec. at Dkt. 55-3, ¶ 7.)  Cadence notes that Pounce USA has willfully avoided paying significant licensing fees, and its default and obstructionist litigation tactics have prevented Cadence from learning the true scope of the damages.  Thus, Cadence requests $300 per act of circumvention given the willfulness of Pounce USA's conduct

for a total of $2,079,900.  In keeping with its previous recommendation, the Court finds that such an award is reasonable.

### D.     Injunctive Relief

Cadence seeks a permanent injunction enjoining Pounce USA's unlawful conduct pursuant to 17 U.S.C. §§ 502, 1203(b)(1).   Section 502(a) provides "[a]ny court having jurisdiction…to grant temporary or final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  Section 1203(b)(1) of the DMCA authorizes a court to "grant . . . permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation."

Permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has already suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest.  *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 391-92 (2006).

The Court finds that under the facts of this case, Cadence is entitled to a permanent injunction.  Pounce USA, in conjunction with Pounce SA, has repeatedly used unauthorized versions of Cadence's software in designing schematics for Pounce SA customers, bypassing Cadence's protections and profiting at Cadence's expense. Given Pounce USA's knowledge of its violations and continued use of Cadence's software, there is no adequate remedy at law to address the ongoing damage and irreparable harm.  Further, the balance of hardships weighs in favor of Cadence, since an injunction will merely prohibit Pounce USA from ongoing unlawful activity.  Finally, the public interest is served when copyright protections are enforced.  Therefore, the Court recommends permanent injunctive relief.

## CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that the District Court GRANT Cadence's motion and RECOMMENDS the following relief:

(1) entry of Default Judgment in favor of Cadence pursuant to Federal Rule of Civil Procedure 54(b);

(2) an award for actual damages for Cadence's breach of contract claim in the sum of $783,310 in lost licensing revenue plus prejudgment interest accrued at the rate of 1.5% per month

through the date of final judgment;

(3) an award of disgorgement of Pounce USA and Pounce SA's profits in the sum of $2,973,065.73 for copyright infringement, as permitted by 17 U.S.C. § 504(b);

(4) statutory damages of $2,079,900 or $300 for each of the 6,933 infringing incidents in accordance with 17 U.S.C. § 1203(c)(3)(A);

(5) an order that Pounce USA and Pounce SA and their agents, employees, affiliates, distributors, successors, assigns, and any other person or entity acting in concert or participation with Pounce USA and Pounce SA be now and forever enjoined from using or downloading, or otherwise accessing the Cadence's Software or any other Cadence's software, including without limitation any and all versions of Allegro, PSpice, and OrCad;

(6) an order that Cadence be awarded its attorneys' fees and costs against Pounce USA and Pounce SA based on section 28 of the Software License Agreement; and

(7) a final judgment in the case, in accordance with Rule 58.

A party may serve and file specific written objections to this recommendation within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b); Civil L.R. 72-3.

**IT IS SO ORDERED**.

Dated: April 1, 2019

SALLIE KIM
United States Magistrate Judge